-1-

1                      UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF KENTUCKY
2                           LOUISVILLE DIVISION


3
    UNITED STATES OF AMERICA,        )    Case No. 3:19-CR-163
4                                    )
                Plaintiff,           )
5                                    )
          VS.                        )
6                                    )
    CHRISTOPHER J. CARROLL,          )
7                                    )    November 10, 2020
                Defendant.           )    Louisville, KY
8


9                              *  *  *  *  *

10                        TRANSCRIPT OF SENTENCING
                   BEFORE HONORABLE REBECCA GRADY JENNINGS
11                      UNITED STATES DISTRICT JUDGE

12                             *  *  *  *  *

13   APPEARANCES:

14   For United States:       Jo Lawless
                              U.S. Attorney's Office
15                            717 West Broadway
                              Louisville, KY 40202
16
     For Defendant:           Brian Butler
17                            Stites & Harbison, PLLC
                              400 W. Market Street, Suite 1800
18                            Louisville, KY 40202


19   [Defendant present.]

20


21                        April R. Dowell, RPR, RMR, CRR
                             Official Court Reporter
22                            232 U.S. Courthouse
                              Louisville, KY 40202
23                              (502) 625-3779


24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25

1                    (Begin proceedings in open court 11:11 a.m.)

2           THE COURT:  We are going on the record today in

3     United States versus Carroll, Criminal Action Number

4     3:19-CR-163.  Can I have appearances for the record?

5           MS. LAWLESS:  Good morning, again, Your Honor.  Jo

6     Lawless on behalf of the United States.

7           THE COURT:  All right.

8           MR. BUTLER:  Good morning, Your Honor.  Brian Butler

9     on behalf of Mr. Carroll.  He's present.

10          THE COURT:  All right.  Good morning, sir.

11          THE DEFENDANT:  Good morning.

12          THE COURT:  Okay.  It's my understanding we're here

13    today for sentencing.  Are there any preliminary matters that

14    the court needs to take up before we move forward?

15          MS. LAWLESS:  Not for the United States.

16          MR. BUTLER:  No, ma'am.

17          THE COURT:  Okay.  All right.  Has the United States

18    made the appropriate notifications pursuant to 18 U.S.C.

19    3771(a)(2)?

20          MS. LAWLESS:  We have, Your Honor.

21          THE COURT:  All right.  And are there any victims

22    wishing to be heard?

23          MS. LAWLESS:  No, ma'am.

24          THE COURT:  Okay.  All right.  So, Mr. Carroll, I'm

25    going to talk to you first.  You're here today represented by

1    counsel and that's Mr. Butler sitting next to you, correct?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Okay.  And as you're aware, back in July

4    you and your attorney appeared and you entered a plea of

5    guilty to Count 1 of the indictment pursuant to a (c) plea

6    agreement.  Do you recall that?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  All right.  And at that point in time I

9    deferred a decision on whether to accept or reject the plea

10   agreement in this case until the court had an opportunity to

11   review the Presentence Investigation Report in this matter.

12   Do you recall that as well?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Okay.  So first I just want to talk to

15   you about how we're going to proceed today.  First thing we're

16   going to do is we're going to talk about the Presentence

17   Investigation Report that was prepared by probation.  We'll

18   address then any objections either side has to that report or

19   the calculation contained in that report.

20             Then although the sentencing guidelines are no

21   longer binding on the court, I am still required to rule on

22   the appropriate guideline range, okay, so we'll do that next.

23   After that I'll hear arguments from both parties regarding any

24   motions for variance or departure from that guideline range

25   and I'll hear from them regarding arguments and what they

1    believe to be the appropriate sentence in this case.

2         After that I'll hear anything that you wish to say

3    directly to the court, it's completely voluntary, but you have

4    that opportunity if you choose to.  I'll make a determination

5    on the record regarding acceptance or rejection of the plea

6    agreement, I'll talk to you a little bit about how the

7    sentencing factors influence my decision and then I'll

8    announce my -- announce the sentence and give you your appeal

9    rights.  Do you generally understand how it's going to work

10   today?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  Okay.  So as we proceed today if at any

13   point in time you don't understand what's going on or you have

14   a question for your counsel, make sure that you stop me and

15   talk to Mr. Butler about it and get your questions answered.

16        You need to understand everything that's going on

17   through the proceedings today, and if you have a question,

18   just feel free to stop me, okay?

19        THE DEFENDANT:  Yes, Your Honor.

20        THE COURT:  Okay.  And do you have family or friends

21   here today?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  Okay.  Family and friends?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  Okay.  All right.  So for you-all,

1    there's going to be three terms you're going to hear a lot

2    throughout the proceedings and I think it's a lot easier for

3    you to understand generally what they are at the start.

4          The first one is the Presentence Investigation

5    Report.  That's a report that was prepared by probation.  It's

6    a thick report; 40-some pages long.  It tells me everything I

7    need to know about the alleged crime in this case, about the

8    situation surrounding that crime, about Mr. Carroll as an

9    individual, educational background, employment, all of those

10   sorts of things; family, health, everything like that.  That

11   report is really helpful to the court because it better helps

12   me understand the defendant and what an appropriate sentence

13   may be based on the crime.

14         The other term you're going to hear about is called

15   the guideline range and the guidelines.  The guidelines are

16   prepared by the United States Sentencing Commission.  It's an

17   independent commission that's created to reduce sentencing

18   disparities.  The hope is that no matter where you're

19   sentenced for what crime, they're all pretty consistent in

20   terms of the crime itself and how that crime is judged or seen

21   in the system.

22         And there's a manual -- it's pretty thick -- that

23   goes along with that with a comprehensive set of rules, so

24   when we refer to numbers and letters, we're referring to this

25   book and the rules that we use in this book.  This book helps

1   us come up with what's called the offense level.  The offense

2   level for the crime involved.  That offense level is put

3   together with Mr. Carroll's personal criminal history and that

4   helps us to determine what the advisory guideline range is.

5        That advisory guideline range is something that once

6   upon a time was mandatory on the court, but now we have some

7   discretion, and so we'll hear arguments from the parties in

8   regards to the appropriate range that should be the sentence

9   in this case.  So hopefully that gives you a little

10  understanding of some of the terms you're going to hear today.

11       Before today's hearing, I reviewed the Presentence

12  Investigation Report, the government's sentencing memo, the

13  defendant's sentencing memo and letters.  Are there any other

14  documents that were not in the case file that I need to have

15  in front of me before I proceed?

16       MS. LAWLESS:  Not that I'm aware of, Your Honor.

17       MR. BUTLER:  No, ma'am.

18       THE COURT:  Okay.  All right.  Mr. Butler, have you

19  and your client read and discussed the Presentence

20  Investigation Report prepared by the United States probation

21  office?

22       MR. BUTLER:  Yes, ma'am; we have.

23       THE COURT:  And do you feel you've had a sufficient

24  opportunity to counsel him in regards to that report?

25       MR. BUTLER:  Yes, ma'am.

1    THE COURT:  All right.  And, Mr. Carroll, have you

2    had a chance to read that report all the way through yourself?

3    THE DEFENDANT:  Yes, Your Honor.

4    THE COURT:  Okay.  Do you feel you've had a

5    sufficient opportunity to talk to Mr. Butler about that report

6    and ask him any questions you may have?

7    THE DEFENDANT:  Yes, Your Honor.

8    THE COURT:  Okay.  So based on my review of the PSR

9    and the passage of applicable time, there do still appear to

10   be some objections to the calculation in the sentencing

11   memorandum as well as, I think, attached at the back of the

12   Presentence Investigation Report.  So, Mr. Butler, do you want

13   to start by addressing the objections?

14   MR. BUTLER:  Yes, Your Honor.  With regard to our

15   objection to distribution, we would withdraw that objection.

16   I believe the probation office calculated that correctly, so

17   we'll withdraw that one.  We do still maintain an objection to

18   the other enhancement.

19   THE COURT:  All right.  Why don't you address -- why

20   don't you start by addressing that then.

21   MR. BUTLER:  Your Honor, the Presentence Report

22   calculates that Mr. Carroll -- excuse me -- should receive a

23   two-level enhancement for being involved in a sex act.  In

24   this particular case, there was allegations that Mr. Carroll

25   enticed -- or attempted to entice Jane Doe 1 and Jane Doe 2 to

1    submit photographs.

2           Both of those young women declined to do so and

3    reported that to their parents who reported it to law

4    enforcement.  And subsequently law enforcement went to

5    Mr. Carroll's residence.  They obtained devices from

6    Mr. Carroll that had a handful of underage pictures on it.

7           One of those pictures, which is referenced in the

8    Presentence Investigation Report and the United States

9    response was a teenage girl that was performing a sex act on

10   herself.  That was not either Jane Doe 1 or Jane Doe 2, and

11   there's no -- there's no information or evidence whatsoever

12   that that was done at his behest.

13          The reason that enhancement becomes applicable -- or

14   not applicable here, but the reason it's in the guideline

15   calculation is -- and I'm -- because of the -- he was charged

16   and convicted, pled guilty to, being sentenced for receipt of

17   child pornography for that -- those images, but because of the

18   attempted enticement, it was cross-referenced to the

19   enticement guideline.

20          Within the enticement guideline, there is reference

21   to a two-level enhancement if a sex act is involved in that

22   crime, but in this particular case, there isn't a sex act

23   involved in this enticement, so I don't believe it applies.

24   There -- again, there's simply no evidence whatsoever that I'm

25   aware of to support the fact that this image was created at

1    his behest, at his request, or anything of the like.  It is

2    simply a picture of an underage girl engaging in a sex act.

3          THE COURT:  Okay.  So your -- your objection is that

4    the cross-reference under 2G2.2 should not apply?

5          MR. BUTLER:  No.  I think it does apply.  I think

6    the issue --

7          THE COURT:  You mean the enhancement does not?

8          MR. BUTLER:  Correct.  I think the issue becomes --

9    is that photograph that the United States referenced in their

10    response saying that this applies, is that involved in that

11    enticement offense, because that's what -- it's an enhancement

12    for enticement.  Did you entice Jane Doe 1, Jane Doe 2, Timmy,

13    whoever, to engage in a sex act.  And if so, then the

14    guidelines say you should get a two-level increase because

15    obviously having sex with an underage minor differentiates a

16    case from someone who maybe got photographs from an underage

17    minor, but here that's not what happened.

18          Here really it's exactly the opposite.  The people

19    that were enticed never even sent any photos much less engaged

20    in a sex act at his behest or with him.  That just didn't

21    happen.

22          THE COURT:  All right.  Is this a 17-year-old?  Are

23    we talking about --

24          MS. LAWLESS:  There are --

25          MR. BUTLER:  Go ahead, Jo.

1            MS. LAWLESS:  Okay.  Sorry.  I didn't want to

2     interrupt Mr. Butler.  There are three different minors.

3            THE COURT:  Jane Doe 1, Jane Doe 2, and the

4     17-year-old.

5            MS. LAWLESS:  Yes.  Yes.  In terms of -- you have to

6     look back at the complaint, Your Honor, where it really

7     fleshes out more of the information that was provided to law

8     enforcement in their investigation going forward and then for

9     reasons that are set out in our sentencing memorandum.

10    Mr. Butler and I worked on moving forward.  And in terms --

11    I'm trying to be cautious because the sentencing memos are

12    filed under seal.

13           THE COURT:  Yeah.

14           MS. LAWLESS:  I don't want you to think I've

15    completely lost all train of thought.  I'm just trying to

16    navigate --

17           THE COURT:  I'm trying to read along with you in the

18    sentencing memo to catch up to where you are --

19           MS. LAWLESS:  Okay.

20           THE COURT:  -- but I think I -- why don't you give

21    me a page number.

22           MS. LAWLESS:  Okay.  I am -- we'll start -- I'm

23    going to skip to Page 3.

24           THE COURT:  Okay.  That's where I am, so we're in

25    the same place.

1          MS. LAWLESS:  Okay.  So there's discussion there

2     about the execution -- or going to visit the grandmother's

3     home, talking to Mr. Carroll, a post-Miranda statement that he

4     gave, additional information that the law enforcement

5     officials obtained.  Now I'm on Page 4.  So if you look at

6     that first full paragraph --

7          THE COURT:  Yep.

8          MS. LAWLESS:  -- I believe in the criminal complaint

9     we may have referred to her by Jane Doe or just initials.  And

10    so we now have another minor, but who is identified certainly

11    as being in a relationship with Mr. Carroll and information

12    that law enforcement obtained from her from her digital device

13    and then search warrants were obtained to search for -- you

14    know, to look at what was on the digital devices.

15         When we look at those -- all of the digital devices

16    including his girlfriend's, you see text messages and sexually

17    explicit images.  Those materials were then compared to

18    Mr. Carroll's phone and Mr. Carroll's iPad.  When they're

19    examining all of the digital devices particularly on the iPad,

20    there are folders that have people's names or initials and

21    those -- that information was then compared to search warrant

22    returns for social media accounts and we looked at

23    communications between Mr. Carroll and the individuals who

24    tied to those folders.

25         So that was part of the process in figuring out who

1    the various individuals were that he was communicating with,

2    people from whom he received sexually explicit images

3    including -- admittedly his girlfriend; nevertheless, she was

4    under the age of 18.

5              THE COURT:  Yes.

6              MS. LAWLESS:  There are descriptions I believe in

7    here -- I think I put all of that in there -- about what you

8    see in some of the images.  At least one involved both

9    Mr. Carroll and his girlfriend.  And while that's not going to

10   meet the federal definition of child pornography, it does meet

11   the definition for sexual contact under 2G2.1 which is the

12   cross-reference that we got from the receipt of child

13   pornography guideline which is 2G2.2.  It took us directly to

14   the production guideline; the 2G2.1.  So that.

15             And then also in the folders if we look at Page 8 of

16   the United States sentencing memorandum, we laid out for the

17   court some of the images that were described for the grand

18   jury.  And I think I explained -- if I didn't, I will explain

19   now -- that whenever these cases involve images and --

20   especially Detective Hedden or any law enforcement officer

21   who's testifying before the grand jury, the grand jurors are

22   advised legally by me if I'm the person presenting the case

23   that they can rely on the testimony of the law enforcement

24   official, the witness, but they also have the right if they

25   want to to review the images that are being described.

1        And so we will have usually -- and this case is a

2   good example because this is the one that says "Carroll, grand

3   jury."  We will have this envelope that has printed out copies

4   of the materials that the witness describes for them.

5        I can't tell you during deliberations whether they

6   look at these images or not.  All I can tell you is they're

7   given the opportunity to compare what the witness describes to

8   what is actually depicted in there.

9        These particular images were pulled from the folder

10  on Mr. Carroll's iPad that relate to his girlfriend.  And we

11  believe that all of that information, Your Honor, including

12  the description of these images meet the definition for sexual

13  contact under the production sentencing guideline which is

14  2G2.1.

15       THE COURT:  Okay.  Mr. Butler, do you want to

16  respond?

17       MR. BUTLER:  Just briefly, Your Honor.  I think

18  that -- I don't -- I'm not disputing that there are those

19  pictures.  I've seen them and they're accurately described in

20  Page 8 (1), (2) and (3).  The difference -- and I think it is

21  a material difference -- is the enticements were to two

22  teenage girls that did not -- they didn't act upon that

23  enticement.  That is the reason that it cross-referenced to

24  the production enticement guideline.  There isn't evidence

25  that he enticed his girlfriend.

1        That was his 17-year-old girlfriend and they --

2    if -- if they are sending pictures back and forth to each

3    other, that's not the same conduct that got him before the

4    court and got him cross-referenced.  It's different.

5        If these images (1), (2) and (3) were of the two

6    girls that reported this, then there's no question it would

7    apply because they would have acted on his enticement, created

8    images for that purpose, and sent them back to him, but that's

9    not what happened here.

10        You have two separate things.  You have two girls

11    that he's enticing that's got him before the court and you

12    have what was then an 18-year-old and then 17-year-old engaged

13    in a relationship that each sent photos back and forth.  I

14    think it's different.

15        THE COURT:  Okay.  So I think we all agree -- let's

16    start with what we agree with.  I think we all agree that the

17    images meet the definition of sexual conduct -- contact

18    pursuant to 18 U.S.C. 2246(3) in terms of what they involve in

19    the images.

20        Sounds to me like the disagreement between the

21    parties about application of this enhancement is who it is.

22    Are we using Jane Doe 3, is that the terminology you prefer on

23    the record?

24        MS. LAWLESS:  I think that's the most appropriate.

25        MR. BUTLER:  His girlfriend.  I think it creates --

1          THE COURT:  Okay, his girlfriend.  So if the

2     question is whether or not the enhancement would apply because

3     it's his girlfriend and not Jane Doe 1 or Jane Doe 2 and

4     whether -- I mean, he -- he could theoretically have been

5     charged with production, correct?

6          MS. LAWLESS:  Yes.

7          MR. BUTLER:  I don't know that -- I don't know that

8     he could have been -- yeah, he could be charged with anything.

9     I don't know if you could be charged with -- if -- if --

10         THE COURT:  Well, because she was -- because of her

11    age -- he could have been charged with production because of

12    her age.

13         MR. BUTLER:  If he caused -- had some role in those

14    photos being created.  If -- if an underage 17-year-old

15    voluntarily sends an underage 17-year-old or an adult

16    18-year-old a picture for whatever reason, I don't think it

17    makes that recipient guilty of production.

18         THE COURT:  Okay.  It would have to be what he

19    requested from her --

20         MR. BUTLER:  That's my belief, yes.

21         THE COURT:  -- based on his age?

22         MR. BUTLER:  Yes, ma'am.

23         THE COURT:  Okay.  So with that being our leading

24    point of where we need to determine a factual issue, I

25    think -- are we back then to the text messages and the

1    comparison of the phones?

2            MS. LAWLESS:  We are, Your Honor.  And I think what

3    sheds some light on this -- and Mr. Butler is correct.  Can I

4    give you a specific -- I don't know if, Detective Hedden, you

5    can correct me -- if we have the exact communication between

6    Mr. Carroll and his girlfriend.

7            What you can see on Page 4 of the United States

8    sentencing memoranda is -- and this is what alerted law

9    enforcement to the fact that there was this ongoing exchange

10   or communications between Mr. Carroll and somebody that law

11   enforcement didn't even know about where they went initially

12   to visit him at his grandmother's.

13           And she sent "You don't get to screenshot my nudes

14   and not call me for good morning love."  I think certainly you

15   can see that there was back and forth between the two of them.

16   She knew that he was screenshotting those nudes.  We have her

17   images in the folder that he set up on his iPad with regard to

18   the girlfriend that involves -- and there are -- there's the

19   one -- just one second.  If you look at Page 8, Your Honor,

20   and it's going to be Paragraph 1 --

21           THE COURT:  Okay.

22           MS. LAWLESS:  -- and you see that description that

23   is laid out there and they're in quotes.  There's a statement.

24           THE COURT:  Yep.

25           MS. LAWLESS:  Okay.  So this is during -- this is,

1    again, communication between Mr. Carroll and his girlfriend,

2    so obviously --

3          THE COURT:  Is he asking for it to be sent?

4          MS. LAWLESS:  All I know is what we have in the

5    picture that she's sending him telling him what it is and a

6    back and forth with them in their communications in addition

7    to the things that he was sending to -- and I am going to

8    switch gears to Jane Doe 1 and 2 on the attempted

9    production -- where he was specifically sending sexually

10   explicit images encouraging those minors to send him images in

11   return.  They declined to do that.

12         So I think that you follow -- the logic is if he's

13   communicating with people he doesn't even know that way, and

14   we see the communications, albeit fragments of them between he

15   and his girlfriend, the fact that she is compliant with

16   sending him -- whether he's requesting or she's offering and

17   they're back and forth --

18         THE COURT:  I don't think whether it's voluntary or

19   not matters.  Do you agree with that, Mr. Butler?

20         MR. BUTLER:  I don't think it matters if it's

21   voluntary.  I do think it --

22         THE COURT:  It matters if it was requested?

23         MR. BUTLER:  Correct.

24         THE COURT:  Okay.  So that is -- in what I'm looking

25   at, I think the factual determination that needs to be made by

1    a preponderance of the evidence here is that issue.  And I

2    think unfortunately based on what I'm looking at, I don't know

3    that I have -- unless you can point me to a page number

4    here -- I don't think I have those communications in any of

5    these memos other than those two quick statements in your

6    memoranda; am I right?  Am I missing the factual basis?

7              MS. LAWLESS:  Give me just one minute.

8              MR. BUTLER:  I agree.

9              THE COURT:  Okay.  Just so everybody knows,

10   probation is not in the room, but I have them -- I am texting

11   with them, so I'm not -- not home shopping on my phone, but

12   I'm communicating with probation.  We just try to keep as many

13   people -- the number of people in the room down for Covid

14   reasons, so I apologize if it looks like I'm texting.  I'm not

15   being rude.

16             MS. LAWLESS:  Your Honor, I had submitted -- I'm

17   sorry, I don't see it, and it's my fault for not putting it in

18   the sentencing memorandum -- examples of the chats between

19   Mr. Carroll and the minors that did not give him what he had

20   asked for --

21             THE COURT:  Okay.

22             MS. LAWLESS:  -- to probation and I think that

23   Ms. Teague would confirm that.  What -- and I'm going to shift

24   gears on you, and I apologize for that, but when I was looking

25   for that information in the PSR on Page 6 --

```
1              THE COURT:  Okay.  Hold on.  Page -- I'm with you.

2              MS. LAWLESS:  Numbered paragraph 21.

3              THE COURT:  Yes, ma'am.

4              MS. LAWLESS:  A sampling of the images that Carroll

5    sent to the minor victims in an effort to get sexually

6    explicit images in return included -- and I give an example

7    here of photos showing a close-up of vaginal and anal areas

8    including three with the outer part of the vaginal being

9    spread by fingers to reveal the vaginal opening and one

10   photograph with the middle finger partially inserted in the

11   vaginal opening.

12              That qualifies as sexual contact as well, Your

13   Honor, and that is in connection with him seeking -- so that

14   would be the attempted production, if you will, with Jane Doe

15   1 and 2.  And that's -- that is another reason and probably a

16   better example, quite honestly, of why the two-level

17   enhancement should apply.

18              THE COURT:  Okay.  I think -- to me there's no

19   question about whether these rise to that level.  I -- and I

20   don't even -- I don't think we have an argument on that issue,

21   and Mr. Butler's saying no, we don't.  I think what I need are

22   what's the chat or what's the communication that we are

23   relying on to say he sought it from the girlfriend.

24              MS. LAWLESS:  Okay.  And I'm sorry.  I've moved away

25   from that.
```

1          THE COURT:  Okay.  So you rely --

2          MS. LAWLESS:  I've moved to --

3          THE COURT:  Okay.

4          MS. LAWLESS:  Because honestly, I don't have that.

5  I have -- I think the inference you can draw between -- in

6  what the communications were that we have between him and his

7  girlfriend.  But another reason that the enhancement should

8  apply is because during the communications when he was trying

9  to get sexually explicit images from the minors who refused,

10 he was sending images to them.

11         THE COURT:  So -- okay.

12         MS. LAWLESS:  And so while he's doing that and

13 asking for it, he's sending -- so he is asking for sexually

14 explicit images from them --

15         THE COURT:  But he's sending what would be

16 considered sexual acts to elicit those?

17         MS. LAWLESS:  Yes.

18         THE COURT:  So pursuant then to Paragraph 1, that

19 would meet the definition of sexual conduct -- contact?  I'm

20 sorry.

21         MR. BUTLER:  But the difference, again, is he's not

22 producing those.  He had those.  That's the distinction

23 between the girlfriend and the two, Jane Doe 1 and Jane Doe 2,

24 is he is attempting to entice them.  There was not a sex act

25 involving them.  He didn't -- they didn't act upon it.  They

1    with -- with his girlfriend he didn't -- there isn't evidence

2    that he produced those images, so it's back to a receipt

3    distribution, not a -- it's not a production sex act.  That's

4    where I think the distinction is.

5              MS. LAWLESS:  And I would disagree, Your Honor.

6    Because attempted production also goes to 2G2.1.  That

7    guideline covers production of child pornography --

8              THE COURT:  And attempted --

9              MS. LAWLESS:  -- and attempted production.  And if

10   you look in here, there is under 2G2.1(b)(3), If the defendant

11   knowingly engaged in distribution, which was applied in this

12   case.

13             THE COURT:  2G2. -- 2G2.1, yes?

14             MS. LAWLESS:  (B)(3).

15             THE COURT:  All right.

16             MS. LAWLESS:  If he engaged in distribution, it's a

17   two-level enhancement.  So this guide -- this guideline like

18   all of them encompasses all of the criminal activity that --

19   that forms the basis of the criminal conduct.  You look at

20   everything.  It's -- they're not just in isolation.  You also

21   look at, okay, if he's distributing, what is he distributing

22   as part of the overall attempted production and production.

23   That's where you go to the subsection right above that,

24   2G2.1(b)(2)(A); the commission of a sexual act or sexual

25   contact.

1          The images that he used to send to the minors in

2    trying to get them to produce child pornography and send it to

3    him involved sexual contact.  That unfortunately is not

4    defined in the commentary.  It refers us to the statute which

5    is 18 U.S.C. Section 2246.

6          THE COURT:  Subsection 3?

7          MS. LAWLESS:  Yes, ma'am.  It means the intentional

8    touching either directly or through the clothing of the

9    genital, anus, growing breasts, inner thigh or buttocks of any

10   person with an intent to abuse, humiliate, harass, degrade or

11   arouse or gratify the sexual desire of any person.

12         THE COURT:  All right.  Let's -- let me back up for

13   a second 'cause we have switched gears a little bit.  As

14   probation has calculated it, they have a level 32 pursuant to

15   2G2.1(a) and 2G2.2(c) which is the cross-reference.  They have

16   an upward adjustment of two which is what we're arguing over

17   under 2G2.1(e)(2)(A).

18         MS. LAWLESS:  Yes, ma'am.

19         THE COURT:  They have an adjustment of two for

20   engaging in distribution pursuant the 2G2.2(b)(3), correct?

21         MS. LAWLESS:  Yes.

22         MR. BUTLER:  Yes.

23         THE COURT:  We're not arguing over that.

24         MR. BUTLER:  No, ma'am.

25         MS. LAWLESS:  No.

1          THE COURT:  And then involving a computer pursuant

2     to 2G2.2(b)(6)(A), which we're also not arguing over.  So

3     your -- I guess I lost your -- I lost your last argument,

4     Ms. Lawless, about 2G2.1(b)(3).

5          MS. LAWLESS:  I was -- I was simply pointing out,

6     Your Honor, that when you have distribution involved in the

7     overall effort for production, which is what this guideline

8     2G2.1 is, it covers attempted production and actual

9     production.

10          So if during the course of the attempted production

11     or production there's distribution that involved -- and in

12     this case we're not arguing over the fact that there was.  It

13     is honestly quite common in production and attempted

14     production cases -- and this is the same argument I made in a

15     case in front of Judge Russell a number of years ago; the Mudd

16     case.  When people --

17          THE COURT:  This is relevant conduct is what the

18     Mudd case talks about.

19          MS. LAWLESS:  This is relevant conduct; yes, ma'am.

20     And it's not uncommon for someone who's trying to get minors

21     to provide sexually explicit images to them to use sexually

22     explicit images.  And I'm not saying Mr. Carroll said these

23     exact words.  They're having fun.  "Here's this."  "Look at

24     that."  You know, "Send me" -- what have you.  If that

25     happens, then you get a plus-two for distribution which

-24-

1   happens in this case.  We also look at the -- in the course of

2   that act of distributing to the minors to get them in an

3   effort to send images back, those -- the images that were sent

4   or distributed involve sexual contact under the definition

5   based on the description that is set out in the Presentence

6   Investigation Report from the investigative materials in the

7   case.

8          THE COURT:  Okay.  And I think what I was trying to

9   define is, you know, we were arguing over 2G2.1(b)(2)(A).  My

10  question is are you not saying it's easier to get there by

11  (b)(3)?  Was that your argument?

12         MS. LAWLESS:  No.  My argument is it all comes --

13  it's all part of it.  And it's not just the communications or

14  not just the images of his girlfriend, but his actions in

15  attempting to get sexually explicit materials from other

16  minors.  During the course of that -- which is all relevant

17  conduct here.  He's charged with receipt -- he distributed

18  images that involved sexually -- sexual contact and that is

19  why the two-level increase for 2G2.1(b)(2)(A) would apply

20  because all of it is part and parcel, admittedly in different

21  components, of the overall conduct.

22         THE COURT:  Okay.  Do you want to respond to that,

23  Mr. Butler?

24         MR. BUTLER:  Just briefly because I think we're at

25  the point where there's a disagreement that you're going to

1    have to resolve.  But I think the distinction is the

2    cross-reference is to a production.  This isn't something --

3              THE COURT:  Or an attempted production.

4              MR. BUTLER:  All right.  Attempted production.  But

5    this isn't something that they have evidence that he did

6    anything to attempt to produce with his girlfriend.  I think

7    therein lies the distinction and that's why it doesn't apply

8    here.

9              THE COURT:  Okay.  And I get the sense from

10   Ms. Lawless' arguments that the application here is -- the

11   basis that you're using here is you're looking at what he's

12   distributing to the minors that brought back or invoked --

13   which invoked the sexual conduct as relevant conduct here that

14   the court can consider as opposed to specifically Jane Doe 1

15   and Jane Doe 2 or even Jane Doe 3.

16             MS. LAWLESS:  That's correct, Your Honor.

17             THE COURT:  So it's the relevant conduct that the

18   court can consider in determining whether that's applicable.

19   I don't think there's any question that it -- and I appreciate

20   the arguments because I think they sort of fleshed out a

21   little bit of where that was going.

22             I think without the chats it's hard to get there

23   using kind of our first discussion.  With the chats, that

24   would be a whole lot clearer.  Without the chats, I think I

25   can still consider the relevant conduct and the overall acts

1    of the defendant regarding the harm.  We can look at the

2    images that he distributed to Jane Doe 1 and Jane Doe 2 and

3    their content -- specifically their content which -- which is

4    where we get to paragraph 21 of the PSR and the images that he

5    sent I definitely believe rise and meet the level of sexual

6    conduct -- or contact.  I keep saying conduct.  Contact.

7           So I think using that 2G2.1(b)(2)(A) would apply

8    here which is the two-level enhancement.  I think when you

9    look at the relevant conduct and the related conduct here, I

10   think you can get to application of that as technically

11   accurate in the calculation of the advisory guideline range.

12          And so I'll find that based on the evidence of what

13   he sent, which would -- I think we have sufficient evidence of

14   that, we can use that upward adjustment plus-two.  All right.

15   Any other objections to the report, Mr. Butler?

16          MR. BUTLER:  No, Your Honor.

17          THE COURT:  Okay.  So with that objection having

18   been ruled on, the PSR will be placed in the record and filed

19   under seal.  In the event of an appeal, the parties, their

20   counsel, and the Sixth Circuit Court of Appeals will have

21   access to the PSR.

22          And, Mr. Carroll, I said the guidelines aren't

23   mandatory but they represent a starting point.  So in ruling

24   on this objection, I now calculate the following advisory

25   guideline range:  The defendant's base level is 32 pursuant to

1    2G2.1(a) and 2G2.2(c).  There's an upward adjustment of

2    plus-two for offense involving commission of a sexual act

3    pursuant to 2G2.1(b)(2)(A) based on the arguments we just had.

4          There's an upward adjustment for two for knowingly

5    engaging in distribution pursuant to 2G2.2(b)(3).  There's an

6    upward adjustment of two for an offense involving a computer

7    to persuade the minor pursuant to 2G2.2(b)(6)(A) making the

8    adjusted offense level 38.

9          There's a two-level reduction for acceptance of

10   responsibility under 3E1.1(a) and a one-level reduction for

11   acceptance of responsibility under 3E1.1(b) should the

12   government make the motion bringing the total offense level to

13   35.  The defendant's criminal history score is zero which

14   places him in a criminal history category of one.

15         This would produce a guideline range of 168 to 210

16   months imprisonment.  Probation is not authorized under the

17   guidelines.  A supervised release range following imprisonment

18   of one to five years and a fine range of 40,000 to $250,000.

19   A mandatory minimum does exist in this case which is five

20   years; however, the applicable guideline range is larger and

21   will stand.  Special assessment is a hundred dollars.

22   Restitution -- have we addressed restitution yet, Ms. Lawless?

23              MS. LAWLESS:  There are no requests for restitution.

24              THE COURT:  Okay.  Thank you.  Forfeiture?

25              MS. LAWLESS:  There were some digital devices.  The

1    plea agreement covers abandonment of those and we'll file a

2    motion with the court to dispose of them.

3              THE COURT:  Okay.  So with those statements having

4    been made, is there any objection now to the guideline range

5    that we have not heard yet?

6              MS. LAWLESS:  No.  And perhaps I misheard you, Your

7    Honor.  On the term of supervised release, what did you say it

8    was?

9              THE COURT:  You know what --

10             MS. LAWLESS:  I thought I heard you say one to five.

11   It's actually five years to life.

12             THE COURT:  Yeah, I apologize.

13             MS. LAWLESS:  That's okay.  I'm sorry.

14             THE COURT:  No, I'm glad you corrected me.

15             MS. LAWLESS:  And we do move for the third point for

16   acceptance of responsibility reduction and we have no

17   objections.

18             THE COURT:  Okay.  All right.  With that motion

19   having been made, I'll grant that motion, so you're going to

20   get full credit for your acceptance of responsibility under

21   your plea agreement.  Okay.  Any other objections to the

22   guideline range?  I apologize for misspeaking.  Yes?

23             MR. BUTLER:  No, Your Honor.

24             THE COURT:  Okay.  All right.  So I've reviewed your

25   (c) plea agreement as well.  It is a (c) plea for 120 months

1   custody.  The supervised range of release is 15 years.  Fine

2   range -- or I'm sorry.  Was it ten?

3           MR. BUTLER:  Ten, Your Honor.

4           MS. LAWLESS:  It was ten.

5           THE COURT:  Ten.  And no fine.  It wasn't addressed.

6   Restitution was to be determined, but it sounds like there are

7   no requests at this time and then the forfeiture was laid out

8   in there.  Is that an appropriate recitation of your plea

9   agreement?

10          MS. LAWLESS:  It is, Your Honor.

11          MR. BUTLER:  Yes, ma'am.

12          THE COURT:  Okay.  All right.  So we've already

13  dealt with the acceptance of responsibility.  I think probably

14  the best way to deal with this is for you both to argue your

15  requested sentence along with the 3553(a) factors together.

16  And I'll let you go first, Mr. Butler.

17          MR. BUTLER:  Judge, I think the United States may

18  have a motion to make.  Do you want to do that or do that when

19  it's their turn to --

20          THE COURT:  If you want to go first, go ahead.

21          MS. LAWLESS:  Do you want me to use --

22          THE COURT:  Yes.

23          MS. LAWLESS:  -- or would you like me to refer to

24  the sealed sentencing memorandum?

25          THE COURT:  Is there a set of headsets over there?

1          MR. BUTLER:  Yes, ma'am.

2          THE COURT:  All right.  If you -- if counsel --

3   you-all are going to approach and you're going to plug yours

4   in right here.  There's a box right here.  So counsel's going

5   to need to come up.  He needs to use a set of -- no, not that

6   headset.  There should be a set that looks like this over

7   there.  And then counsel can approach.  If you have your own,

8   you can bring them up, if you're that prepared.  If you're

9   not, there's a set up there for you.

10          (Bench conference filed under seal.)

11          THE COURT:  All right.  Mr. Butler, do you want to

12   argue?

13          MR. BUTLER:  Yes, Your Honor.

14          THE COURT:  I shouldn't say "argue."  Do you want to

15   speak on behalf of your client?

16          MR. BUTLER:  Yes, ma'am.  Judge, we would

17   respectfully ask the court to accept the agreement.  Just want

18   to make a few brief comments.  And in relation to those

19   comments, I want to say I -- you know, I want to start --

20   obviously this is the type of thing that the parents of these

21   two young girls -- it's a nightmare.  So anything that I say

22   doesn't minimize, I hope, that -- I appreciate as a parent

23   that this would be a very difficult situation.

24          I also appreciate that these young girls were

25   probably put in a situation not knowing where to go, not

1     knowing "Can I tell my mom and dad because I've done some

2     things I shouldn't have done to start with and now I've got

3     myself in a box?"

4           I also appreciate in this that Chris went further

5     than the typical unfortunate childhood back and forth with

6     these pictures that is -- is all too common -- is all too

7     common in our society, so I start out by saying all that.  So

8     I don't want to minimize that because I know that this caused

9     harm and I know it caused anxiety and I know that these people

10     are probably still dealing with this to some extent.

11           I say all that -- I think this case to me has really

12     shined a light on just how harsh federal sentencing can be.

13     Chris, when he committed these acts, he was 18 and 19 years

14     old.  These were his contemporaries.  This isn't the case --

15     this is why I think the guidelines and some of these mandatory

16     minimums at times are just so devastatingly harsh.

17           I don't know what was in Congress' mind when they

18     passed these laws, but I can only assume from my perspective

19     what I think of is, you know, a 50-year-old man like myself

20     sending these -- doing these kind of things with teenage girls

21     and we would all be just appalled and would not want me

22     anywhere near any young girls.

23           That's not what we have here.  We have a -- really a

24     contemporary.  He knew these girls from church.  It's not very

25     churchy act that he did and I appreciate that, but if he was a

1    few months younger -- just a very few months younger when he

2    did this, he's in Hardin Juvenile Court going to counseling

3    and maybe or maybe not going to a camp and his life is back on

4    track.  And -- and he's probably ruined in that community

5    with -- in his reputation, but he moves forward from this, but

6    because of some magic line that we've set in the law -- if you

7    accept this and I hope you will -- he's going to spend his 20s

8    in federal prison.  To me that is incredibly harsh.

9         But as you know as well as anyone at this point with

10   the mandatory minimums of other potential charges, this is

11   absolutely positively the best case scenario if the government

12   chose to charge him with other offenses.

13        He's -- what he did was a bad thing, but he is not a

14   bad person.  I've got to know him.  I mean, he's -- you know,

15   he was set up to be a really successful member of society.  He

16   was in college.  He was planning on finishing a criminal

17   justice degree.  He had gotten in the E-town Police cadets

18   program.  He was a volunteer firefighter.  He's won -- and

19   I've sent them to you -- countless awards for his ability in

20   audio visual.  The sky was the limit.

21        I mean, you've got multiple letters from people from

22   his church that frankly know about what happened.  I mean,

23   this was the talk of their small community.  I mean, it really

24   impacted this small group of people within that church

25   context.  And nobody's condoning what he did, his parents

1    don't condone what he did, but, you know, it's just tragic to

2    me that he sits here at 21 years old and he's going to be gone

3    this long, but that is the law.  None of us are past it.

4    That's where it is.

5         He's done everything he can to try to mitigate the

6    damage to himself and given that, you know, if the court were

7    to reject it, the government has the option of charging him

8    with things that carry a higher mandatory minimum and have

9    advised they would.  We'd ask you to accept the agreement,

10   Your Honor.

11        THE COURT:  Okay.  Ms. Lawless?

12        MS. LAWLESS:  Your Honor, we also encourage you to

13   accept the (c) plea for things that we talked about at the

14   bench.  I agree with a lot of things that Mr. Butler has said

15   about his client.  We have some disagreements, however.  We

16   very likely wouldn't be here today if this was a single

17   incident, if it was limited to communications between him as

18   an 18-year-old and his 17-year-old girlfriend.  I'm certainly

19   not advocating that and it is against the law, but we --

20   that's not what happened.  There were other young people

21   involved and they were disturbed, they were concerned, their

22   parents were.

23        And what we put together -- and when I say "we" I

24   include the excellent advocacy that Mr. Butler has provided to

25   his client was to look at everything.  And Mr. Butler and I

1    used to be colleagues in the United States Attorney's Office,

2    so he is very familiar with how things get charged, with the

3    guidelines, with statutory mandatory minimums.

4         And so we talked very early on and tried to best do

5    what we could to capture the essence of the criminal conduct

6    while adhering and being honest and true to the law, the

7    statutes, the guidelines, and at the end of the day, this is

8    what we came up with.  Is it perfect?  No, but it was our very

9    best effort to do that.  And I talked about the 3553(a)

10   factors in our sentencing memo.

11        I mean, although we landed at a receipt of child

12   pornography charge, it is still serious particularly when you

13   take into account all of the relevant conduct and you have

14   seen that and know about that.

15        What we've recommended to you, the ten-year sentence

16   followed by ten years supervised release, we do believe

17   reflects the seriousness, promotes respect for the law and

18   provides just punishment and serves as a deterrent to

19   Mr. Carroll and to others.  It meets basically -- what I'm

20   saying -- the 3553(a) factors and we would encourage you to

21   accept the (c) plea that the parties have tendered.

22        THE COURT:  All right.  Mr. Butler, does your client

23   wish to allocute?

24        MR. BUTLER:  Yes, ma'am; he does.

25        THE COURT:  Okay.  You can go forward, sir.

1          THE DEFENDANT:  Your Honor, I just want to say

2    something briefly to you and also to the court a little bit

3    about myself.  Ever since I can remember, I've dedicated my

4    life to try and be a successful and productive member of

5    society.

6          I started working for the local television station

7    at 13, multiple video production awards that you've seen

8    through Western Kentucky University, student technology,

9    leadership conferences in Lexington, Kentucky High School

10   Technology Association, different film festivals.

11          I lead myself and teams to televise local sporting

12   events, live government meetings, documentaries for the

13   Kentucky High School Basketball Hall of Fame, community and

14   school events, and even earning a certificate of skill

15   retainment and communications endorsed by former Governor

16   Bevin.

17          As soon as I could drive at age 16, I was stopping

18   and helping people who broke down on the side of the road even

19   though people told me it was dangerous to do so.  I knew I

20   wanted to help people that were in need.

21          During my junior year in high school, I was awarded

22   Tuesday Teen; an article in the local paper highlighting

23   teenagers doing outstanding work in the community.  Then when

24   I turned 18, I joined the Elizabethtown Police Department's

25   cadet program and helped them with security at different city

1    events, training officers, and learning more about law

2    enforcement.

3          After graduating high school with a work ethic

4    certification showing my dedicated work character, I started

5    community college with a major in criminal justice.  When I

6    turned 19, I joined the local fire department responding to

7    every call I could when I wasn't at work, became a state

8    certified firefighter in only six months; something most

9    people take about two years to complete by traveling all

10   across the state for different trainings.

11         I did all this without pay or reimbursement for

12   traveling.  I did this because I knew I wanted to help people,

13   and if I wanted to help people, I wanted to know how to do it

14   right.  After joining the fire department, I knew I wanted to

15   help more citizens of the county, so I became a 911

16   dispatcher.  I wanted to be the calm voice to help people get

17   through their worst moments in life and send police, fire, and

18   EMS to those who need it.  I knew I was not only helping the

19   citizens of the county but also the first responders of the

20   county.

21         I traveled to Richmond, Kentucky, for five weeks

22   becoming a distinguished graduate of my department of criminal

23   justice telecommunications class making me a state-certified

24   911 dispatcher.  I accomplished all this while maintaining

25   close family relationships, a relationship with my girlfriend

1   who's now my fiancé, Sabrina, all while being a teenager just

2   a year and a half out of high school.

3         Then I lost everything a couple of days before I

4   turned 20:  My job, my volunteer work, my friends, my freedom,

5   and now as of yesterday, one of my best friends, my granddad.

6   And I could not even be there at the end when maybe he needed

7   someone there the most and won't be allowed to go to his

8   memorial service; what he wanted me to conduct for him were

9   some of his last wishes.

10        Now that I'm 21, for almost two years I've been

11  reflecting on my life and yes I did make a stupid choice as a

12  teenager.  I wish I would have known pictures of people your

13  age, even if they were pictures of your girlfriend, can have

14  for years hold such great consequences.

15        They teach you in school don't do drugs with the

16  DARE Program but never if you send a picture of a -- send or

17  receive a picture of a teenager it's considered child porn and

18  has such harsh consequences.

19        If you accept this plea with good time, I have a

20  chance to be out in eight and a half years when I'm 28.  I

21  will be spending my 20s incarcerated and after will be unable

22  to go on vacation or switch jobs without permission from

23  probation, won't be able to join the fire department until I'm

24  38, not even be able to take my future son or daughter to

25  school or any other school activities until I'm at least 48.

1          I won't get my second chance until almost 30 years

2     from now.  Even then I seen still won't be a true citizen.

3     Never once been able to vote for president and will never get

4     to.  In ten years I'll be 31.  Ten years ago I was only 11 in

5     seventh grade.

6          I know my actions have not only hurt me, but they've

7     also hurt my family, the victims, including my fiancé, and for

8     this I am very sorry and can only ask for their forgiveness

9     and for your mercy.  I know I've let a lot of people down in

10    my community from those that I've helped to those that I've

11    worked with.

12         I can honestly say this will be the last time you

13    see me in your courtroom or any courtroom for that matter

14    because when I get out I won't even break the speed limit.

15    Thank you, Your Honor.

16         THE COURT:  All right.  Thank you, sir.  All right.

17    Anything further from the parties?

18         MS. LAWLESS:  No, Your Honor.

19         MR. BUTLER:  I'm sorry, Your Honor.

20         THE COURT:  Anything further?  No, it's okay.  I

21    want to make sure he gets all his questions answered.

22         MR. BUTLER:  Not about the sentence.  There's a

23    couple issues after the court pronounces sentence.

24         THE COURT:  Okay.  All right.  I've taken a long

25    look at this and I think a lot of what we argued about earlier

1   today, while technically important to the guideline range, is

2   not quite frankly as important to my determination of the

3   sentence under the 3553(a) factors.

4           I think this is one of the cases -- and I agree with

5   Mr. Butler.  This is one of the cases where the guidelines --

6   I'm glad the guidelines are not binding anymore.  I think the

7   guidelines here would produce a harsh result.

8           And the discretion that the court has is really

9   looking at the factual situation that's presented here.  And I

10  think both counsel have done a very good job of really looking

11  at the offensive conduct and distilling this down to what is

12  appropriate.  I do think the (c) plea for 120 months is

13  appropriate.

14          I'm basing that primarily on the age of both the

15  victims and the defendant at the time the actions took place,

16  the nature of Jane Doe 3 or the girlfriend and the

17  relationship that existed there.  I'm taking all of that into

18  account.  I think the -- it's a very serious crime.  It's very

19  serious for the victims in this case and I recognize that.

20          I think this sentence certainly will deter future

21  conduct, I certainly think it will promote respect for the

22  law, and acknowledges the seriousness of the offense while at

23  the same time taking into account the very specific factual

24  scenario that occurred in this case.

25          I think the overall guideline range is, as

1   Mr. Butler said, for maybe something a little different than

2   what we were looking at here, so I think the 120 months

3   recognizes the seriousness while taking into accounting both

4   the individual, his background, his relationship with these

5   individuals as well as the ages of all of them and the content

6   that was distributed.

7          With that being said, I also believe that

8   Mr. Carroll's background in the PSR speaks to someone who

9   certainly can be a very productive member of society and do

10  good things.  And this is one of those circumstances -- and

11  I'm going to say it to you again at the end because you need

12  to probably hear it twice, but this is one of those

13  circumstances where you need to pay your debt to society for

14  what you've done and then you need to turn around when you get

15  out and move on and do good things.  I think you can do that.

16  This is not --

17          I mean, it's something that's going to hang over

18  your head for a very long time, but you have to serve your

19  debt and then move on.  And moving on is going to be difficult

20  for you, I know.  It looks like you have a very supportive

21  family.  You have a lot of people here.  And so once you serve

22  your debt to society, then you move on, okay?

23          You've got an educational background, a family

24  support group, and I think you can do good things.  It's going

25  to hang over your head for a while, but you need to not let

1    that stop you from being a productive member of society.  It

2    sounds like you can do that, okay?  I'm going to say that to

3    you again at the end 'cause it is a long sentence but it was a

4    serious crime.  So I'm going to accept the (c) plea agreement

5    here and conclude that it complies with all the purposes set

6    forth in 3553(a) and so pursuant to 11(c)(4), I'll accept it.

7            So having considered the advisory guidelines in

8    3553 (a), the court impose the following sentence:  It's the

9    judgment of the court that the defendant is committed to the

10   custody of the Bureau of Prisons for a term of 120 months as

11   to Count 1 of the indictment.

12           Upon release from imprisonment the defendant shall

13   be placed on supervised release for a term of ten years as to

14   Count 1.  The defendant shall abide by the standard conditions

15   of supervision adopted by the court as well as the special

16   conditions; a copy of which has been provided to defendant and

17   counsel.  Is that correct, Mr. Butler?

18           MR. BUTLER:  Yes, ma'am.

19           THE COURT:  Okay.  These special conditions include

20   sex offender conditions which will be explained by the United

21   States probation office.  The defendant is required to pay a

22   special penalty assessment fee of a hundred dollars as to the

23   single count of conviction.

24           The $5,000 per count assessment under the provisions

25   of the Justice for Victims Trafficking Act of 2015 is waived

1   due to the defendant's inability to pay as set forth in the

2   Presentence Investigation Report.  Any financial sanctions

3   imposed shall be paid in accordance with the schedule of

4   payments page contained in the judgment.

5          Restitution has not been requested in this case, and

6   the fine and the costs of investigation, prosecution,

7   investigation, and supervision are waived due to the

8   defendant's inability to pay.

9          Having considered the 3553(a) advisory guidelines

10  which produce a total offense level of 35 against a criminal

11  history category of one with advisory guidelines ranges of 168

12  to 210 months, a fine of 40,000 to $250,000, and five years to

13  life of supervised release, having granted the motions made at

14  the bench, the court believes that a sentence of 120 months

15  custody followed by ten years supervised release is sufficient

16  but not greater than necessary to comply with the purposes set

17  forth in Section 3553(a)(2).

18         The court notes that even if the guideline range had

19  been correct -- or incorrect as argued by the defendant, the

20  court would have imposed the same sentence under 3553(a)

21  factors considering those factors as a whole in this case.

22  Are there any objections to the sentence just pronounced or

23  the special conditions imposed?

24         MS. LAWLESS:  No, Your Honor.

25         MR. BUTLER:  Yes, Your Honor.  Just one.  If we

1    could, this is one of the matters I wanted to take up.

2              THE COURT:  Okay.

3              MR. BUTLER:  In the sex offender conditions upon

4    release, obviously it has the condition that he not have any

5    contact with any victims.  We would ask the court to make

6    special --

7              THE COURT:  For his fiancé?

8              MR. BUTLER:  Yes, ma'am.  She's here.  She is

9    willing to speak and very much wants contact with him and

10   obviously he wants contact with her and she's an adult now,

11   Your Honor.

12             THE COURT:  Okay.  Ms. Lawless, any objection?

13             MS. LAWLESS:  No, ma'am.

14             THE COURT:  Okay.  Without objection -- I think --

15   the way I read the charging document, it's really Jane Doe 1

16   and 2 and the remainder of it is really related conduct, is

17   that correct, Ms. Lawless?  I haven't looked at the indictment

18   exactly.

19             MS. LAWLESS:  Well, the indictment is a lot

20   different than the complaint, Your Honor --

21             THE COURT:  That's right.  Okay.

22             MS. LAWLESS:  -- for all of the things that we've

23   talked about.  But we acknowledge that his girlfriend is

24   now -- has now reached the age of majority and have no

25   objection.  And certainly if she's indicated -- and I believe

1    Mr. Butler -- that she wants to have contact.  We would ask

2    him not to have contact with the other people.

3              THE COURT:  Jane Doe 1 and 2.

4              MR. BUTLER:  Correct, Your Honor.

5              THE COURT:  Okay.  All right.  I think that's

6    reasonable under the circumstances.  I will ask probation how

7    best to reflect that in the specific language.  Okay.  So,

8    Mr. Carroll, I don't have control over the Bureau of Prisons.

9    I say that multiple times a day.  I have no control over them,

10   but I do make recommendations as part of the judgment and I'm

11   willing to make recommendations.

12             Those can be things as far as what types of

13   programming, a certain location may have available, and the

14   location of the prison itself.  I can't guarantee that, but

15   I'm happy to make recommendations.  So, Mr. Butler, have you

16   talked to Mr. Carroll about that and have any requests?

17             MR. BUTLER:  Yes, Your Honor.  We would request that

18   you recommend the RDAP program based upon Presentence

19   Investigation Report's substance abuse.  And he is also

20   requesting that the court recommend he go to Elkton, Ohio.

21             Apparently he's done a fair amount of research and

22   they offer the RDAP program as well as a sex offender

23   treatment program, so that appears to be the place closest to

24   his home of record that offers both of those opportunities.

25             THE COURT:  All right.  Are you-all from

1   Elizabethtown?  Yes.  Okay.  All right.  Typically I don't

2   request a specific location because if for some reason that

3   location is unavailable, whether they have an outbreak of

4   Covid or there's no more beds there or there's some issue,

5   then they don't necessarily default then to what's next

6   closest for your family.

7        So I don't know how you feel about this, Mr. Butler,

8   but I might make the recommendation one, RDAP, two, as close

9   to his family in Elizabethtown, Kentucky, as possible.  And if

10  there's something else you want, but -- he's going to be

11  evaluated for sex offender therapy and there are several

12  locations that have that.  I would just subject that instead

13  of specifying a specific location, we would specify as close

14  to his family as possible.

15       MR. BUTLER:  Judge, you would see this more than I

16  do on a day-to-day basis.  We would defer to you.

17       THE COURT:  Okay.  Is there any objection to that,

18  Ms. Lawless?

19       MS. LAWLESS:  No, ma'am.

20       THE COURT:  Okay.  Let me do that.  I'm going to do

21  recommendation that you be evaluated for the RDAP program

22  first because that's usually the harder thing to get into and

23  he would probably qualify for time as a benefit of that

24  program and then as close to your family in Elizabethtown as

25  second, okay?

1     MR. BUTLER:  Yes, ma'am.

2     THE COURT:  All right.  I'm happy to make that

3 recommendation.  Okay.  So, Mr. Carroll, I now need to cover

4 your appeal rights.  Under certain circumstances either you or

5 the United States would have the right to appeal your guilty

6 plea, conviction, or sentence; however, as part of your plea

7 agreement, you included a waiver of some of your appeal

8 rights.  Do you recall that?

9     THE DEFENDANT:  Yes, Your Honor.

10    THE COURT:  Okay.  I believe you waived your right

11 to appeal except for circumstances of prosecutorial misconduct

12 or ineffective assistance of counsel.  While those waivers are

13 typically upheld by the courts, any notice of appeal that you

14 wish to make on any ground must be filed within 14 days of the

15 judgment.  And the judgment in this case will probably be

16 entered sometime later this week towards the end of the week.

17 If you are unable to pay the cost for appeal, you can apply

18 for leave to appeal as a pauper.  Do you understand these

19 rights, sir?

20    THE DEFENDANT:  Yes, Your Honor.

21    THE COURT:  Okay.  So magically on the screen --

22 okay.  This is an acknowledge of your waiver of appeal rights

23 that I'm going to need you to sign.  And apparently we have

24 put the podium all the way down really low.

25     Over there on the podium, Mr. Carroll, I'm going to

1   ask you to step over there and sign that acknowledgment of

2   your waiver of appeal rights.  It's a little electronic pen

3   pad over there.  And there's hand sanitizer on the podium as

4   well.  Is there anything else in regards to your appeal

5   rights, Mr. Butler, that I need to cover with him?

6          MR. BUTLER:  No, Your Honor.

7          THE COURT:  Okay.  All right.  Andrea, did that

8   take?  Yes.  Okay.  So for the record, the acknowledgment of

9   waiver of appeal rights has been signed in open court.  And

10  Mr. Carroll is currently in custody and he'll be remanded to

11  the custody of the United States Marshals for delivery to the

12  Bureau of Prisons.

13         So I'm going to say it again.  You're going to serve

14  your debt to society and then you're going to move on because

15  you definitely have an educational background and family

16  support to do that and I have faith that you will.  I also

17  have faith that I won't see you again.  Correct?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Okay.  And certainly to your family and

20  friends, I think sometimes in the criminal justice system

21  families sort of get forgotten, so -- as well as victims,

22  quite frankly, and so I like to acknowledge when you-all come.

23  I appreciate that.  I see you.

24         I know this is probably just a difficult a day for

25  all of you as it is for Mr. Carroll, so I certainly appreciate

1   you being here.  And certainly I hope that he'll be placed

2   somewhere where you're able to visit him and I hope you'll

3   provide him as much support as you feel that you're able,

4   okay?  So thank you for that.

5            Ms. Lawless, anything further?

6            MS. LAWLESS:  No, Your Honor.

7            THE COURT:  Okay.  And I'll sign -- I'll sign the

8   forfeiture whenever you have that ready to go.  I don't think

9   there's any objection to that.  I just looked over what was in

10  that -- what was in that agreement.

11           MS. LAWLESS:  Thank you.

12           THE COURT:  Okay.  Mr. Butler, anything further?

13           MR. BUTLER:  No, Your Honor.

14           THE COURT:  All right, thank you, Counsel.  I

15  appreciate it.  Good luck, sir.

16  (Proceedings concluded at 12:25 p.m.)

17                    C E R T I F I C A T E

18     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

19  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20

21

        s/April R. Dowell                4/20/22
22  Official Court Reporter, RMR, CRR          Date

23

24

25